**Carmen FERSTL, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A. 03–2323–GTV.**

United States District Court, D. Kansas.

March 3, 2005.

---

Sharon J. Meyers, Kansas City, MO, for Plaintiff.

Christopher Allman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VanBEBBER, Senior District Judge.

Plaintiff Carmen Ferstl brings this action pursuant to 42 U.S.C. § 405(g) and D. Kan. Rule 83.7, seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") to deny her application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Plaintiff claims that she is impaired due to injuries she suffered in a motor vehicle accident on January 28, 2000. Specifically, Plaintiff alleges that she suffers severe pain, swelling and stiffness in her left ankle, leg, and wrist, as well as her right hip and back. The record indicates that Plaintiff completed high school and one year of cosmetology school. Her past work experience includes working for the Kansas Department of Human Resources as an employment and training representative and as a claims taker. For the following reasons, the Commissioner's decision is reversed and remanded for further proceedings.

## I. PROCEDURAL BACKGROUND

On August 31, 2001, Plaintiff filed an application for disability benefits, claiming disability since January 28, 2000. The application was denied both initially and upon reconsideration. At Plaintiff's request, an administrative law judge ("ALJ") held a hearing on October 10, 2002, at which Plaintiff and her counsel were present. On February 27, 2003, the ALJ rendered a decision in which he determined that Plaintiff was not under a "disability" as defined by the Social Security Act. After

the ALJ's unfavorable decision, Plaintiff requested review by the Appeals Council and submitted additional evidence not before the ALJ. The Appeals Council denied Plaintiff's request for review on May 9, 2003. Plaintiff again submitted additional evidence to the Appeals Council for its consideration. On June 23, 2003, the Appeals Council vacated its May 9, 2003 decision, but denied Plaintiff's request for review. The ALJ's decision therefore stands as the final decision of the Commissioner.

## II. STANDARD OF REVIEW

The Commissioner's findings are binding on this court if supported by substantial evidence. 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record and whether the Commissioner properly applied relevant legal standards. *Marshall v. Chater*, 75 F.3d 1421, 1425 (10th Cir.1996) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir.1994)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano*, 26 F.3d at 1028 (citations and internal quotation marks omitted). The court may not reweigh the evidence or substitute its judgment for that of the ALJ or the Commissioner. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1500 (10th Cir.1992).

## III. PLAINTIFF'S MEDICAL BACKGROUND AND THE ALJ'S FINDINGS

### A. Plaintiff's Testimony at the ALJ Hearing

On October 10, 2002, Plaintiff testified before the ALJ. As a result of her injuries from the January 2000 car accident, Plaintiff stated that she suffered facial damage; her left leg was injured after a rod went through it just below her knee; her ankle was fractured in several locations; she fractured her left wrist; and she eventually suffered a post traumatic hematoma in her right hip. Furthermore, Plaintiff testified about the symptoms she still experienced because of these injuries. In particular, Plaintiff claimed that sensitivity in her left leg prevented her from wearing hose or slacks. Plaintiff also stated that she has frequent headaches, difficulty sleeping at night, and blurry vision and dizziness when she gets up in the morning. Plaintiff testified that she could stand no longer than ten to fifteen minutes before her right side became stiff and that she could sit only ten to fifteen minutes before her back and right hip started to tingle, burn and become stiff. Plaintiff informed the ALJ that her most comfortable position was to lie on her right hip and shoulder with her left leg elevated. Moreover, Plaintiff stated that she occasionally needed a walker to ambulate, although the ALJ noted that she was not utilizing one at the hearing. Since the car accident, Plaintiff estimated that she has gained sixty pounds.

On a typical day, Plaintiff stated that she gets up, moves around, and tries to be somewhat of a housewife by doing little things. She stated that she has difficulty putting her clothing on, that she does some cooking and cleaning around the house, and that she drives a car "off and on." Plaintiff also attends church, but she testified that she must sit with her left leg slightly elevated and that she is not able to kneel. Plaintiff reported that she took six medications for pain on a daily basis, as well as Neurontin for numbness, Meclizine for dizziness, and a diuretic to control the accumulation of fluids in her body.

Plaintiff testified that she attempted to return to work at the Kansas Department

of Human Resources in November 2000, despite her doctor's concerns. She stated that she initially worked minimal hours, then increased to four hours a day, and by March 2001 she worked eight hours a day. She claimed that her position as an employment and training representative required her to find jobs for one hundred and fifty clients and resulted in an excessive amount of paperwork and walking. She also reported that the job forced her to constantly sit, stand, walk, bend, stoop, and squat to retrieve files. As a result, Plaintiff alleged that her left leg swelled and became discolored, and that she was not able to concentrate because of pain she experienced. She tried elevating her leg while she was sitting at her desk, but that did not alleviate her problem. Plaintiff continued to work until July 30, 2001, when she quit her job because of the constant swelling in her left leg and her concentration problems.

### B. Medical Evidence From Plaintiff's Treating and Consulting Physicians

#### 1. Dr. Powers

Dr. Robert Powers, Plaintiff's primary care physician, examined Plaintiff on a continuing basis after her automobile accident in January 2000. On October 2, 2001, Dr. Powers wrote an opinion letter to an attorney regarding Plaintiff's medical history after her automobile accident. He noted that since January 2000, neurologists, orthopedic surgeons, and pain management and rehabilitation physicians performed diagnostic and surgical procedures on her left leg, right hip and groin area. He stated that although Plaintiff attempted to return to work, she continued to suffer intractable pain and that it was finally determined on September 11, 2001 that she was totally disabled. He opined that Plaintiff "is, and will be, permanently disabled the rest of her life and will probably suffer significant pain in her left lower leg due to the trauma of nerve injury as well as the evacuated hematoma [in her right flank and buttock] with the associated scarring . . . ."

On October 7, 2002, Dr. Powers submitted a Physical Residual Functional Capacity ["RFC"] questionnaire that posed a number of questions regarding Plaintiff's condition. In the questionnaire, Dr. Powers diagnosed Plaintiff with reflex sympathetic dystrophy. He described Plaintiff's pain as "chronic," "severe," and "incapacitating," and stated that he expected no improvement. When asked to identify the clinical findings and objective signs to support these responses, Dr. Powers cited the multiple scars on Plaintiff's leg and hip, her deformed left leg, and her tenderness to any touching or pressure in those areas. He further found that Plaintiff's pain was severe enough to constantly interfere with her attention and concentration, even for simple work tasks or low stress jobs. In terms of Plaintiff's physical capabilities, Dr. Powers checked boxes indicating that she could sit and stand for less than two hours in an eight hour workday. He noted that Plaintiff would need to elevate her leg with prolonged sitting and utilize a cane or assistive device while engaging in standing or walking.

Dr. Powers filled out an "Attending Physician's Statement of Disability" on December 27, 2002. On that form, Dr. Powers indicated that Plaintiff suffered from reflex sympathetic dystrophy, citing pain in her shoulder, arm and leg. He also noted the following objective findings to support his diagnosis: a deformed leg; multiple scars on her leg and arm; and tenderness to palpation. He concluded that Plaintiff's progress was unchanged, she was totally disabled for any occupation, and she would never be able to resume any work. Again, he cited that her

pain level limited her employment possibilities.

Dr. Powers filled out a second RFC questionnaire in April 2003, after the ALJ's decision. Dr. Powers's answers are substantially similar to his responses in the October 2002 questionnaire, but his diagnosis of reflex sympathetic dystrophy mentioned only Plaintiff's pain in her left leg. Of further note, Dr. Powers stated that Plaintiff's good days would still be incapacitating and that she would likely miss more than four days of work per month as a result of her impairments. He also mentioned that she has shown no improvement since January 2001.

Finally, the record contains Dr Powers's treatment notes from March 2, 1999 through October 7, 2002. MRI reports from August 2002 demonstrated an unremarkable MRI of Plaintiff's sacrum, sacroiliac joints and her thoracic spine. The August 2002 MRI of her lumbar spine, however, showed "multi-level degenerative disc disease with early changes in the spinal stenosis related to hypertrophic facet degenerative disease and bulging discs."

### 2. Dr. Becker

Dr. Karl Becker treated Plaintiff for pain at the University of Kansas Pain Management Center. On September 28, 2000, Plaintiff visited Dr. Becker, complaining of pain and swelling in her left leg and foot. Upon examination, Dr. Becker noted that Plaintiff had very mild swelling and normal skin temperature in her left calf and foot, with hypersensitivity to light touch over several scars secondary to her trauma. He concluded that Plaintiff suffered from low back pain and lower extremity pain. In a follow up letter to Dr. Murphy, Dr. Becker stated that he believed that Plaintiff suffered from pain in her lower left extremity, but he did not believe that she had "significant signs or symptoms of reflex sympathetic dystrophy."

Plaintiff visited Dr. Becker again on January 10, 2001. At that time, Plaintiff still complained of pain and swelling in her left leg and foot, numbness in her right hip, and pain from a hematoma in her right gluteal region. In a follow up letter to Dr. Murphy, Dr. Becker stated that he believed that Plaintiff had possible mild sympathetic dystrophy involving her left ankle and foot and that he treated her with a lumbar sympathetic epidural block. He also stated that Plaintiff had a trochanteric bursitis and that he performed a trochanteric bursa injection. Dr. Becker examined Plaintiff two weeks later, noting that he did not plan to continue performing lumbar sympathetic blocks or trochanteric bursa injections on Plaintiff due to her lack of response and the fact that she had no signs of reflex sympathetic dystrophy. He did plan to do scar infiltration into the area of a painful scar beneath her left patella, and he prescribed her Neurontin and Celebrex for pain. Dr. Becker also gave Plaintiff a work release, advising her to return to work four hours a day, or additional hours depending on her tolerance level. In a follow up letter to Dr. Murphy, Dr. Becker stated that he did not believe that she had mild sympathetically maintained pain, but that she probably continued to have a mild trochanteric bursitis and a painful scar beneath her patella.

Plaintiff's medical records reflect that she returned to see Dr. Becker on February 22, 2001. Dr. Becker noted that the scar injection he performed during Plaintiff's last visit provided Plaintiff relief for one week, but that Plaintiff now complained that the pain had started to return. Plaintiff reported to Dr. Becker that she was able to work six hours a day, and that working eight hours a day caused her some back discomfort the next day. Dr. Becker performed another scar injection because of Plaintiff's painful scar beneath her patella.

### 3. Dr. Murphy

Treatment records from Dr. Robert Murphy, Plaintiff's treating orthopedist, between February 2000 and July 2002, reveal that Plaintiff continually complained of pain in her left leg, left ankle, left wrist and right hip as a result of her car accident. On May 12, 2000, Dr. Murphy noted that Plaintiff, for the first time, complained of pain and swelling in her left knee, left ankle and her right hip. He referred her to Dr. Reddy Katta for therapy on her back and hip, took some x-rays of her ankle, and encouraged her to be as active on her ankle as possible. On June 12, 2000, Dr. Murphy stated that Plaintiff complained of pain in her hip and back and that he had referred her to Dr. Katta to treat those problems. He commented that x-rays of her ankle looked good and that she could be as active as she wanted on it. Dr. Murphy also examined Plaintiff on August 24, 2000, two weeks after having surgery on her hematoma in her right gluteal region. At that time, Dr. Murphy noted that Plaintiff's symptoms in her right rip significantly improved because of the surgery, although she still complained of swelling in her left leg. He also noted that Plaintiff had excellent motion in her ankle. A treatment record from September 7, 2000 indicates that Plaintiff complained of diffuse pain and swelling in her left leg. Dr. Murphy performed a physical examination on that day, noting that her skin texture and temperature appeared normal, and that he did not observe much swelling, redness, or tenderness. He did not believe that Plaintiff had "reflex sympathetic dystrophy brewing." Dr. Murphy concluded that Plaintiff should be referred to a pain management clinic for treatment, including possible thrombotic problems and possible reflex sympathetic dystrophy. On June 25, 2001, Plaintiff visited Dr. Murphy, complaining of pain in her left leg and right hip. Because Plaintiff suffered from a complex pattern of injury, Dr. Murphy referred her to the doctors at the pain management clinic who would better be equipped to handle her problems.

Dr. Murphy did not examine Plaintiff again until January 7, 2002. At that time, Plaintiff complained of left leg and wrist pain. Dr. Murphy did not know what was causing her wrist pain, observing no areas of tenderness, swelling or discoloration. He also did not know what was causing her leg pain, finding "[n]o overlying skin changes, discoloration, alteration, . . . sweating, hyperesthesia, or any other problems that one might associate with a reflect sympathetic dystrophy." As to her ankle, Dr. Murphy noted that x-rays showed good healing of her fractures and alignment of the fractures and fixation device. Dr. Murphy observed that Plaintiff had been to the pain clinic, physical therapy, and tried all kinds of medicines. He concluded that Plaintiff should see Dr. Katta again and try to lose some weight to alleviate her lower extremity symptoms.

Finally, Plaintiff visited Dr. Murphy on July 29, 2002, complaining of hypersensitivity around her left ankle and a pressure sensation in her left leg. He noted that her symptoms have been present for a long time, but she did not appear to be getting any better despite going to multiple pain clinics and doctors. He did not know what was causing her symptoms and he referred her to a pain clinic physician for possible treatment of reflex sympathetic dystrophy.

### 4. Dr. Reddy Katta

Between February 2000 and January 2003, Plaintiff periodically visited Dr. Reddy Katta, an orthopaedist. Dr. Katta's initial evaluation of Plaintiff in February 2000 observed that Plaintiff admitted having pain in her neck and lower back, as well as numbness in her left upper extremity, right hand and right thigh areas. Dr. Katta noted that Plaintiff took Tylenol III,

Ultram, Vicodin and Percocet for pain. Dr. Katta reported in a follow up visit on May 12, 2000, that Plaintiff complained of pain in her right hip area, and numbness in her left leg and foot and her right hand. Dr. Katta stated that Plaintiff remained "independent with basic mobility and most of the aspects of her self care." He recommended that Plaintiff continue her water aerobics, use moist heat on her hip and thigh area, and perform stretching exercises. Dr. Katta also advised Plaintiff to use her walker until the pain improved. He concluded that Plaintiff could not "return to her work at least for the next two months."

On June 5, 2000, Plaintiff informed Dr. Katta that she had not been attending water aerobics and that the pain medication had not been helping her. Plaintiff also told Dr. Katta that her pain increased with any activity and that she could not sit, stand or walk for more than ten to fifteen minutes at a time. Upon physical examination, Dr. Katta reported that movements in Plaintiff's lower back were painfully limited, Plaintiff had no pain with range of motion of her left ankle, she had dysesthesia to touch around the left ankle, and that she had tenderness to palpation over the right hip area. Again, Dr. Katta noted that despite continued back and hip pain, Plaintiff remained "independent with basic mobility and most of the aspects of her self care." Dr. Katta also changed Plaintiff's pain medication, advised her to participate in water aerobics, and told her that she could not return to work for at least the next two months.

Plaintiff saw Dr. Katta on August 18, 2000, soon after the hematoma was drained from her right buttock area. She complained of pain in her right hip area, and upon physical examination, Dr. Katta noted that she had tenderness to palpation over her right trochanteric bursa area with relative weakness of her right hip girdle

muscles. He recommended that Plaintiff continue her medication, use ice packs or moist heat on her right hip area, and continue using her roller walker. Dr. Katta advised Plaintiff that if her pain persisted, he wanted her to return the following week to consider an injection in her right trochanteric bursa.

Plaintiff did not see Dr. Katta again until September 11, 2001. On that day, she complained of pain in her back, hip, left knee, and left lower extremity. Dr. Katta noted that Plaintiff tried to work for six months, but that Dr. Powers took her off work because she could not continue. Dr. Katta's physical examination of Plaintiff revealed some pain in her lumbar spine after extreme range of motion, tenderness to palpation over her lumbar spine, mild tenderness over her left calf, and some swelling of her left lower extremity when compared to her right side. Dr. Katta noted that Plaintiff came into the office walking without an antalgic gait and that she was not using any assistive devices. He diagnosed Plaintiff as suffering from chronic low back pain because of a lumbosacral sprain with probable associated degenerative joint disease and degenerative disk disease. Dr. Katta recommended Plaintiff use moist heat or ice packs on her left knee and lower back, followed by trigger point massage, stretching exercises, as well as walking and water aerobics. He also advised Plaintiff to use a cane or walker. At Plaintiff's request, he prescribed Tylenol III for pain disturbing her sleep.

On January 18, 2002, Plaintiff returned to see Dr. Katta, still complaining of back and lower extremity pain. Plaintiff did not arrive at Dr. Katta's office using an assistive device. At Plaintiff's request, Dr. Katta performed trigger point injections for pain in her right trochateric bursa area. Dr. Katta again advised Plaintiff to

continue her present medication and home exercise program, to participate in a water aerobics plan on a regular basis, and to use a walker or a cane.

Plaintiff's next visit of record with Dr. Katta was not until January 16, 2003, when she complained of pain in her lower back, right hip, elbow and shoulder, and numbness and tingling in her right hand. At that time she was taking Neurontin and using Lidoderm patches for pain. Plaintiff arrived at Dr. Katta's office using a walker. Dr. Katta assessed that Plaintiff continued to suffer lower back pain with a right trochanteric bursitis. He stated that no clinical evidence supported lumbar radiculopathy, but that there was clinical evidence of right carpal tunnel syndrome. Dr. Katta referred Plaintiff for physical therapy to help ease her shoulder, elbow, and right hip tendinitis pain, and commented that she may benefit from carpal tunnel release.

### 4. Dr. Neblock–Bierne

On August 10, 2000, Dr. Tammy Neblock–Bierne drained Plaintiff's hematoma on her right hip. Dr. Neblock–Bierne examined Plaintiff again on July 25, 2001, after Plaintiff complained of pain in her right hip region and claimed that she had difficulty ambulating. Dr. Neblock–Bierne noted that the incision on Plaintiff's right hip area healed well, that there was no palpable evidence of a hematoma or fluid collection, and that Plaintiff's skin in that area was sensitive on touch. Dr. Neblock–Bierne ordered an MRI of Plaintiff's right hip area. Dr. Neblock–Bierne also mentioned that Plaintiff could benefit from aggressive physical therapy and that "[i]t may also be necessary for her to be on disability secondary to these injures." She specifically cited the difficulty Plaintiff incurred with ambulation and standing on her feet for a long time. An MRI of Plaintiff's right hip, performed by Dr. John Bramble on August 2, 2001, reflected "scar tissue formation along the surface of the gluteus maximus muscle and along the iliotibial tract" and "a small amount of fluid on the surface of the scar tissue."

### 5. Dr. Hendler

Dr. Hendler performed a consultative examination on November 5, 2002. After assessing Plaintiff, Dr. Hendler reported that although she demonstrated some symptom magnification, she also demonstrated significant physical limitations in ambulating. He stated that she needed to use her walker for safe ambulation, that she would not be able to walk or stand beyond a minimal amount, and that her pain and mood behaviors "would also be quite limiting."

### C. The ALJ's Decision

In his February 27, 2003 decision, the ALJ made the following findings:

1. The claimant met the earnings requirements of the Act on January 28, 2000 and continued to meet them through the date of this decision.

2. The claimant was working as an employment and training representative from January 28, 2000 through July 30, 2001. She earned an average of $1,251.87 per month in 2000 and an average of $1,371.32 per month in 2001 (20 C.F.R. §§ 404.1574 and 416.974).

3. The claimant's work activity involved significant physical or mental activities for pay or profit (20 C.F.R. §§ 404.1572 and 416.972).

4. The claimant's work activity from January 28, 2000 through July 30, 2001 constitutes substantial gainful activity within the meaning of the regulations (20 C.F.R. §§ 404.1572 and 416.972).

5. The claimant has not engaged in substantial gainful activity since July 31, 2001.

6. The medical evidence establishes that the claimant has the following severe impairments as of July 31, 2001 and thereafter: is status post an open reduction and internal fixation of a left ankle fracture and pinning of a left first metacarpal fracture on January 29, 2000, status post an August 10, 2000 incision and drainage of a large right hip hematoma, status post a February 22, 2001 left patella scar infiltration and injection, has minor degenerative changes in the left wrist, multilevel degenerative disc disease with early stenosis related to hypertrophic facet degenerative disease and bulging discs and neural foraminal encroachment primarily at the L5–S1. Nevertheless, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Appendix 1, Subpart P.

7. The claimant's testimony and that of her witness is not found credible when considered in light of the medical signs and findings, history of medical treatment, reports of treating and examining physicians and the inconsistencies in the claimant's testimony, all of which is discussed more fully in the Rationale section of this decision.

8. The claimant had the residual functional capacity to perform work-related activities as of July 31, 2001 and thereafter except for lifting or carrying more than ten pounds maximum occasionally and five pounds frequently (20 C.F.R. § 404.1545).

9. The claimant is able to perform her past relevant work as a claims taker as of July 31, 2001 and thereafter.

10. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, since January 28, 2000 and through the date of this decision (20 C.F.R. § 404.1520(f)).

## IV. DISCUSSION

"The Secretary has established a five-step sequential evaluation process for determining whether a claimant is disabled." *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir.1988). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* Those five steps are as follows:

(1) A person who is working is not disabled.

(2) A person who does not have an impairment or combination of impairments severe enough to limit the ability to do basic work activities is not disabled.

(3) A person whose impairment meets or equals one of the impairments listed in the regulations is conclusively presumed to be disabled.

(4) A person who is able to perform work she has done in the past is not disabled.

(5) A person whose impairment precludes performance of past work is disabled unless the [Commissioner] demonstrates that the person can perform other work. Factors to be considered are age, education, past work experience, and residual functional capacity.

*Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988) (citing 20 C.F.R. § 416.920(a)-(f)) (internal citations omitted).

Plaintiff contends that the ALJ committed errors at step four. Specifically, she asserts that: (1) the ALJ failed to properly assess the credibility of her complaints of severe pain; (2) the ALJ did not give controlling weight to the opinion of her primary treating physician, Dr. Powers; and (3) the ALJ failed to adequately develop the record regarding her depression

and anxiety. The court will address Plaintiff's first two arguments together and her third argument separately.

### A. Credibility Determination and Weight Given to Dr. Powers's Opinion

Plaintiff first maintains that the ALJ improperly dismissed her allegations of pain in his credibility determination. She claims that her pain constitutes a severe impairment. In support, Plaintiff cites to the opinions and notes of Dr. Powers, Dr. Becker, Dr. Murphy, and Dr. Katta, asserting that these four treating physicians made repeated references to her severe pain. Plaintiff also emphasizes that she is taking several medications for pain, and that since her accident, she has tried to lessen her pain with physical therapy, water aerobics, moist heat and ice packs, wrist support splints, support stockings, injections in her scars, surgery on her hematoma, a lumbar sympathetic epidural block, and a trochanteric bursa injection. Plaintiff argues that she tried to comply with every treatment plan prescribed by her doctors and that she should not be faulted for going back to work earlier than her doctors advised.

Second, Plaintiff argues that the ALJ failed to give the opinion of Dr. Robert Powers, Plaintiff's primary treating physician, controlling weight. Plaintiff asserts that the lack of substantial evidence contrary to Dr. Powers's opinion, the fact that Dr. Powers based his opinion on objective examinations performed by him and other physicians, and that his opinion is consistent with the opinion of Dr. Hendler, dictates a reversal of the Commissioner's decision.

The Commissioner responds that the ALJ considered Plaintiff's subjective complaints of pain in accordance with Social Security Regulations. The Commissioner states that the ALJ properly considered Plaintiff's complaints of pain along with the objective medical evidence of record, Plaintiff's work record, her medication, and her daily activities. The Commissioner also contends that the ALJ properly assigned Dr. Powers's opinion less weight because his opinion was inconsistent with the objective evidence in the record.

#### 1. Relevant Legal Standards

##### a. Credibility Determinations

■ Because the ALJ is " 'optimally positioned to observe and assess witness credibility,' " *Adams v. Chater,* 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 801 (10th Cir.1991)), the court "may overturn such a credibility determination only when there is a conspicuous absence of credible evidence to support it," *Patterson v. Apfel,* 62 F.Supp.2d 1212, 1217 (D.Kan.1999) (citing *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992)). Credibility determinations made by the ALJ are generally treated as binding upon review. *Talley v. Sullivan,* 908 F.2d 585, 587 (10th Cir.1990).

■ When evaluating the credibility of a claimant's complaints of disabling pain, the ALJ should ask these questions: "(1) whether [the][c]laimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and [the][c]laimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, [the][c]laimant's pain is in fact disabling." *Musgrave v. Sullivan,* 966 F.2d 1371, 1376 (10th Cir.1992) (citing *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987)). The ALJ should also consider the following factors:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain

relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony with objective medical evidence.

*Huston v. Bowen,* 838 F.2d 1125, 1132 (10th Cir.1988). " '[D]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe ... as to preclude any substantial gainful employment.' " *Williams v. Chater,* 923 F.Supp. 1373, 1380 (D.Kan.1996) (quoting *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir.1988)).

### b. Controlling Weight to a Treating Physician's Opinion

 "A treating physician's opinion about the nature and severity of the claimant's impairments should be given controlling weight by the Commissioner if well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record." *Walker v. Apfel,* No. 97–1189–MLB, 1998 WL 928672, at *4 (D.Kan. Sept.18, 1998) (citing *Castellano,* 26 F.3d at 1029). If a treating physician's opinion is inconsistent with other evidence, the ALJ must determine whether the other evidence outweighs the treating physician's opinion. *Goatcher v. United States Dep't of Health & Human Servs.,* 52 F.3d 288, 290 (10th Cir.1995). In weighing any medical opinion, the ALJ must consider the following factors: (1) the "length of the treatment relationship and the frequency of examination"; (2) the "nature and extent of the treatment relationship"; (3) the amount of relevant evidence supporting the physician's opinion; (4) how consistent that opinion is with the rest of the record; (5) whether the physician is a specialist; and (6) other factors tending to support or

contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6). The ALJ cannot disregard a treating physician's opinion that a claimant is disabled without giving legitimate and specific reasons. *Goatcher,* 52 F.3d at 290 (citing *Frey v. Bowen,* 816 F.2d 508, 513 (10th Cir.1987)). But the ultimate responsibility for determining whether a claimant is disabled is reserved for the ALJ, not the treating physician. *Castellano,* 26 F.3d at 1029 (citations omitted).

### 2. Plaintiff's Case Should Be Remanded For Further Proceedings

After reviewing the ALJ's opinion, the court concludes that the Commissioner's decision should be reversed and remanded for further proceedings before the ALJ. Specifically, the court determines that the ALJ should reevaluate Plaintiff's credibility and his decision to give Dr. Powers's opinions little weight applying the above legal standards.

After considering the medical evidence of record, Plaintiff's work activity, and her activities since July 31, 2002, the ALJ determined that Plaintiff's testimony regarding her subjective complaints, functional restrictions, and activities of daily living were exaggerated. The ALJ reviewed the results of several CT scans, x-rays, MRIs, surgeries and tests performed on Plaintiff subsequent to the January 2000 car accident. He concluded that Plaintiff's complaints about her symptoms were inconsistent with her doctors' clinical findings and reports, as well her own statements contained in those reports. In particular, the ALJ noted that x-rays and MRIs demonstrated that Plaintiff's left wrist and ankle healed completely. He also stated that the progress notes of record contained little, if any, objective findings supporting the severity, duration or intensity of Plaintiff's alleged pain, including support for her alle-

gations of debilitating swelling, numbness, tingling, blurred vision, dizziness, and difficulty concentrating. The ALJ cited Dr. Hendler's opinion that Plaintiff exhibited "symptom magnification" and a note from Dr. Becker in January 2001 that Plaintiff could work four hours a day or more if she could tolerate it.

The ALJ also based his decision on the absence of any evidence showing that her medications were ineffective or caused adverse side effects. The ALJ acknowledged Plaintiff's history of treatment, citing the evidence that she received lumbar epidural injections for pain, underwent physical therapy, and used TED hose stockings for her legs. The ALJ further observed that there was no indication that Plaintiff lost weight after one of her doctors advised her to do so. Moreover, the ALJ stated that Plaintiff's allegation of disability was inconsistent with the work she performed from November 2000 through July 2001 and her occasional driving, cooking, dusting, and mopping. The ALJ further found that no treating doctor indicated that Plaintiff needed to use a walker or cane.

Finally, the ALJ concluded that the opinions of Dr. Powers and Dr. Hendler merited little weight. He characterized both physicians' opinions as conclusory and inconsistent with the objective medical evidence in the record, including Plaintiff's diagnostic and laboratory tests. Citing Dr. Powers's October 2001 opinion letter and his October 2002 RFC assessment, as well as Dr. Hendler's November 2002 consultative exam, the ALJ stated that both doctors failed to provide any specific signs or findings to support their opinions regarding Plaintiff's limitations. The ALJ commented that Dr. Powers's progress notes contained minimal findings and that Dr. Hendler's opinion was based on a one-time examination.

■ As an initial matter, the court believes that the ALJ properly considered Plaintiff's work history and daily activities as part of his credibility determination. *See Williams*, 923 F.Supp. at 1379 ("Evidence of employment during a period of alleged disability is highly probative of a claimant's ability to work."); *Reece v. Barnhart*, No. 00–4155–JAR, 2003 WL 1785792, at *2 (D.Kan. Mar.28, 2003) (stating that the determination whether an attempt to work "confirm[s] or refute[s] the existence of a disability" should be made on a case by case basis); *Allen v. Apfel*, 54 F.Supp.2d 1056, 1064–65 (D.Kan.1999) (stating that "the ALJ should consider whether the plaintiff's daily activities are substantially consistent with the kind and extent of disability claimed"). The court, however, concludes that the ALJ's failure to make detailed findings regarding Plaintiff's level of pain medication, the effectiveness of her medications, the side effects of her medications, and the frequency of her medical contacts undermines the ALJ's credibility determination and merits remand.

The ALJ stated in his decision that there was no indication in the record that Plaintiff's pain medications were ineffective when taken or that they caused Plaintiff's alleged side effects. The court's review of the record does reflect that Plaintiff's medications did not always work, and her continued complaints of pain to her doctors is consistent with this notion. Additionally, the record also indicates that the medications Plaintiff's doctors prescribed caused her some dizziness.

The court is also troubled by the ALJ's failure to make a finding pertaining to the level of medications Plaintiff's doctors prescribed for her. In February 2000, shortly after Plaintiff's car accident, Dr. Katta noted that Plaintiff was taking Tylenol III, Ultram, Vicodin, and Percocet for pain.

As of May 2000, Dr. Katta remarked that Plaintiff was taking Celebrex as an anti-inflammatory medication and Lortab for pain. Dr. Katta changed Plaintiff's pain medication in June 2000, prescribing her Oxycontin for pain and Neurontin for dysesthesia in her left ankle, but later that month Plaintiff went back to taking Lortab because of the dizziness she experienced with Oxycontin. By August 2000, Dr. Katta stated that Plaintiff was taking Lortab for pain, Celebrex as anti-inflammatory medication, and Neurontin for neuralgia. In September 2000, Dr. Becker prescribed Plaintiff Celebrex and Neurontin. By January 2001, during the period Plaintiff returned to work, Dr. Becker noted that Plaintiff was not taking any medications, but he prescribed Celebrex, Neurontin, and Nortriptyline for her symptoms.

A progress note dated September 11, 2001 from Dr. Katta instructed Plaintiff to continue taking Celebrex and advised her that she may increase her doses of Neurontin on an as-needed basis. Per Plaintiff's request, Dr. Katta also prescribed Tylenol III for pain disturbing her sleep. As to the effectiveness of these medications, Plaintiff stated on a Social Security activities form dated September 24, 2001, that Neurontin and Celebrex did not always work, and that the Tylenol III was effective. A medication flow sheet from Dr. Powers indicates that as of August 2002, Plaintiff was taking the following medications: Neurontin, Celebrex, Oxycontin, and Lasix. Plaintiff testified at the ALJ hearing in October 2002 that she was taking six medications for pain, as well as Neurontin for tingling and numbness, Meclizine for dizziness, and Lasix for accumulation of fluid. Plaintiff also claimed that she felt dizzy or nauseated from the medications, but the ALJ never elicited any testimony as to the effectiveness of them. Finally, in January 2003, Dr. Katta noted that Plaintiff was taking Neurontin and using Liboderm patches for pain.

On remand, the ALJ should reevaluate Plaintiff's credibility utilizing the questions outlined in the Tenth Circuit's decision in *Musgrave*. Moreover, the ALJ is directed to reevaluate the Plaintiff's credibility based on the level of medications prescribed by her doctors and make specific findings concerning the effectiveness of her medications. The ALJ is directed to elicit testimony from Plaintiff concerning the effectiveness of her medications and to develop the medical record as to the same. In addition, the ALJ should factor the frequency of Plaintiff's medical contacts into his credibility determination.

■ Next, the court determines that remand is appropriate so that the ALJ can make specific findings, linked to evidence in the record, as to why he did not give Dr. Powers's opinion controlling weight. Again, the ALJ is directed to apply the relevant factors the Tenth Circuit outlined in *Goatcher*.

Dr. Powers stated in two RFC assessments and a letter to an attorney that Plaintiff is totally and permanently disabled for any occupation because of "severe" and "incapacitating" pain. In October 2002, Dr. Powers based this determination on a diagnosis of reflex sympathetic dystrophy, citing back pain, the scars on Plaintiff's left leg and right hip, and her tenderness to palpation in those areas. Dr. Powers filled out a second RFC after the ALJ's decision, relying on Plaintiff's severe leg pain for his diagnosis of reflex sympathetic dystrophy. In a conclusory fashion, the ALJ discounted Dr. Powers's opinion without linking his determination to specific medical evidence from the record.

Dr. Powers's diagnosis of reflex sympathetic dystrophy does have support from Dr. Murphy. A progress note from Dr. Becker dated September 28, 2000 observed that Plaintiff "does not have significant

signs or symptoms of reflex sympathetic dystrophy." This is consistent with Dr. Murphy's statement in September 2000 that Plaintiff did not have "reflex dystrophy brewing." In January 10, 2001, Dr. Becker believed that Plaintiff suffered from mild reflex sympathetic dystrophy and a trochanteric bursa. Two weeks later, however, Dr. Becker determined that Plaintiff had no signs of mild reflex sympathetic dystrophy, but he believed that she had a painful scar and a possible trochanteric bursitis. In January 2002, Dr. Murphy examined Plaintiff and concluded that she did not have any problems that might be associated with reflex sympathetic dystrophy in her left leg. But in July 2002, Dr. Murphy stated that Plaintiff complained of hypersensitivity around her left ankle and a pressure sensation in her left leg. He suspected that those symptoms might be on the basis of a reflex sympathetic dystrophy. As a result, he referred Plaintiff to see Dr. Thomas Smith for evaluation and treatment of the same. The court observes that one of Dr. Powers's progress notes specifically cites Dr. Murphy's July 2002 diagnosis of reflex sympathetic dystrophy. Additionally, Dr. Powers's first RFC questionnaire refers to Dr. Thomas Smith's treatment notes. The record before the court, however, does not include Dr. Smith's treatment notes concerning Plaintiff's treatment for reflex sympathetic dystrophy. Because it is the ALJ's duty to fully develop the record, on remand, the ALJ should supplement Plaintiff's medical record with Dr. Smith's treatment notes.

Furthermore, Dr. Powers's first RFC questionnaire cited Plaintiff's chronic leg, hip, and back pain, her multiple scars on her leg and hip, and her tenderness to palpation to support his opinion. While the record indicates that Plaintiff's wrist and ankle fractures healed properly, it is apparent from the examinations performed by Dr. Becker, Dr. Murphy, Dr. Katta, Dr.

Neblock–Bierne, as well as the numerous CT scans and MRIs performed on Plaintiff, that Plaintiff's continued problems with pain in her right hip, left leg, and back are well-documented. For instance, the court observes that Plaintiff's chronic back pain is supported by the MRI taken on her lumbar spine and Dr. Katta's treatment notes. While the court recognizes that Dr. Powers's treatment notes are not highly detailed, it appears that his RFC opinions are based in part on the treatment notes and tests performed by other specialists, as well as his continual treating relationship with Plaintiff. On remand, the ALJ should explain why he believes that Dr. Powers's opinions are not supported by the treatment notes of Dr. Becker, Dr. Murphy, Dr. Katta, Dr. Neblock–Bierne, as well as the CT scans and MRIs performed on Plaintiff. Finally, although the ALJ gave Dr. Hendler's opinion little weight, the court observes that the ALJ cited Dr. Hendler's opinion that Plaintiff demonstrated symptom magnification to support his credibility determination. Therefore, on remand the ALJ should clarify the weight he assigns to Dr. Hendler's examination.

### B. Duty to Develop the Record Regarding Depression

Finally, Plaintiff contends that the ALJ improperly disregarded her claims of depression and anxiety. In his decision, the ALJ did not find Plaintiff's claims of anxiety and depression credible, citing "minimal signs or findings of symptoms in the treatment notes of record and only a single psychological consult in the record." Plaintiff acknowledges that limited evidence of treatment for depression exists in the record, but she asserts that the treating notes of Dr. Powers, in addition to the circumstances surrounding her automobile accident, justified further investigation into Plaintiff's mental impairments. Specifical-

ly, Plaintiff suggests that the ALJ should have ordered Plaintiff to undergo a psychiatric consultative examination or contacted Dr. Powers for clarification on his opinion of Plaintiff's depression and anxiety.

▆▆▆▆ As mentioned before, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised. This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented." *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir.1993) (internal citations omitted). An ALJ may have a duty to order a consultative examination when "such an examination is necessary or helpful to resolve the issue of impairment." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir.1997); *see Robertson v. Chater*, 900 F.Supp. 1520, 1530 (D.Kan.1995) (citations omitted). The ALJ has broad discretion in deciding whether to order such an examination. *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir.1990). Nevertheless, while the ALJ has a duty to develop the record, it remains Plaintiff's burden to establish that she was disabled. *Hill v. Sullivan*, 924 F.2d 972, 974 (10th Cir.1991) (citation omitted); *see Hawkins*, 113 F.3d at 1167 (stating that "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision" triggers an ALJ's duty to investigate).

▆▆▆ The ALJ was correct to disregard Plaintiff's alleged depression because Plaintiff did not present sufficient medical evidence to warrant further investigation. Dr. Monica McNamara evaluated Plaintiff on March 2, 2000, three months after the automobile accident that resulted in the death of her sister and serious injuries to her brother and herself. At that time, Plaintiff reported to Dr. McNamara that

she felt overwhelmed by the recent tragedy. Dr. McNamara recommended that Plaintiff participate in counseling and psychotherapy for her grief. Dr. McNamara also noted that Plaintiff appeared opposed to antidepressant medication and that she would continue to monitor the situation. As Defendant points out, the record does not indicate that Plaintiff ever sought additional counseling for her grief or tried to obtain medication.

The court concludes that the ALJ fulfilled his obligation to fully develop the record as to Plaintiff's alleged depression. Plaintiff, who was represented by counsel, did not request a consultative mental examination, but she now argues that the ALJ should have ordered a consultative mental examination or contacted Dr. Powers. Although the ALJ has a duty to develop the record, Plaintiff maintains the responsibility of providing medical evidence of a mental impairment.

IT IS, THEREFORE, BY THE COURT ORDERED that the decision of the Commissioner is reversed and remanded to the administrative law judge for further proceedings consistent with this opinion.

Copies of this order shall be transmitted to counsel of record.

The case is closed.

**IT IS SO ORDERED.**